Good morning. Good morning. A couple minutes to get set. Okay, please proceed. May it please the court, Kenneth Carpenter appearing on behalf of Mr. Encarnacion. Under the correct interpretation of 38 U.S.C. 5109, capital A, small a, and 38 U.S.C. section 7261A3, capital A, and 4, Judge Greenberg was required to reverse the decision of the board that was appealed by Mr. Encarnacion to the Court of Appeals for Veterans Claims. The review of the board decision by the Veterans Court was based upon an allegation of clear and unmistakable error, which is no different than the review required by the Veterans Court for any other appeal, which the Veterans Court in Evans referred to as a direct appeal. Mr. Carpenter, it's a pleasure to see you again. It's very nice to see you. Help me understand something about this case that's truly puzzling. What is a scope of review? What does that phrase mean to you? I know there's a standard of review, and I know there are criteria for review. I have no idea what a scope of review is. Help me. All I can tell you, Your Honor, is that Congress used that phrase as the title of 7261, scope of review. I will tell you candidly, I don't know either. I assume— Well, I'm never sure whether Congress actually writes those titles or whether some editor puts it in the title. That's fair. Congress normally, if I understand correctly, enacts legislation and then gets edited or codified. But tell me what is a scope of review, forgetting the title, in terms of substance? What does that mean? Well, I think— You keep complaining that they didn't do the scope of review correctly, but I don't understand that. Help me. Well, what I'm suggesting, Your Honor, is that Congress dictated in the text of 7261 the legal standards upon which the Veterans Court should conduct review of the decisions of the Board of Veterans' Appeals. And that in that context, they specifically identified the analysis that was to be made. For instance, if a material finding of fact was made, that that was subject to reversal. Further, that if a determination of any kind was made by the Board or a finding was made or a conclusion was made, that that was subject to modification, remand, or reversal by the Court of Appeals for veterans' claims. Now, nobody's quarreling with that. The case before us is a Q case. That's correct, Your Honor, in which the reviewing judge said that but for the instructions in Evans, he would have reversed that decision. But in your view, is there no difference between the standard of review and the inquiry of the Court of Veterans' Claims, whether or not it was the initial rejection of the TDIU claim or whether it was 30 years later on acute blame? Yes, Your Honor. That is precisely my position. There is no difference. There's no difference at what they should look on review at the Court of Veterans' Appeals? That the Veterans' Court articulated early on in its Archer case that when the Court was reviewing matters that involved allegations of clear and unmistakable error, that it was not reviewing the substantive allegations. It was reviewing what the Board did in assessing those. And that is no different in the assessment of an allegation of Q than it is in an allegation of an entitlement to a benefit. Well, the original entitlement, you're dealing with whether or not he was entitled. In connection with the Q, you're dealing with whether he was entitled to a Q. And we've got cases, including Morris, that establish what you have to prove or do in order to get a Q claim approved, which is different and substantially harder and narrower than the standard with which we review the original denial of the complaint. Am I missing something, or ...? No, Your Honor. You're absolutely correct. But what the en banc court did in Evans was different. The en banc court in Evans articulated that the court cannot review a Q motion under the same standard by which it reviews matters on direct appeal. There is no support for that statement, which is the statement that we believe flummoxed Judge Greenberg in this case, because he reads, Evans, that there are two separate standards. There is a standard for reviewing... Wait a minute. I'm looking at Morris. And Morris says the veteran has to prove for a Q claim or appeal of a Q claim either the correct facts were not before the adjudicator or the statutory regular provisions at the time were incorrectly applied, B, the error was undebatable, and 3, the error was outcome determinative. That is not the same standard or analysis or framework that one uses for the rejection of an initial TDIU claim, right? That's correct, Your Honor, but... Yeah, so everything I've read to you in terms of the standard that we've said and the analysis we've said applies to review of a Q claim is entirely different from review of an initial TDIU. In which we look to see if there's substantial evidence in the record to support the fact-finding, in which we look to see if there's arbitrary and capricious action by the decision-maker. None of that's... Thank you for quoting from Morris because you saved me from having to do it. There are those three criteria in Morris, and they're quite different for the court to be concerned about. Let me move to a slightly different argument, which you didn't make, and I wonder why. At the end of the opinion by the judge, Greenberg, I think it was... Yes. He says, in its decision, the board cited evidence that the court has previously found sufficient to deny a motion for revision based on Q, i.e., that the appellant was capable of coherent and logical thought. The court need not address the appellant's arguments further, and it is regrettably forced to affirm the decision on appeal. That's a very strange position. I don't understand it. I'm sure the government will explain it to me. But what he seems to be saying is that a motion for revision based on Q can be decided simply if the appellant was capable of coherent and logical thought. Well, that's clearly wrong. So what are we to make of that? Why aren't you talking about that problem instead of scope of review, which is something I don't understand? Help me. Well, the reason is, Your Honor, is that Judge Greenberg made it clear that he was relying upon the direction from the en banc court in Evans, and that the direction of the en banc court in Evans was that there were two different standards. Whether you call it scope of review or you call it legal standard for review, that there are separate standards. I need to respond to Judge Prost's point relative to Morse. In Morse, Morse is discussing what the appellant needs to establish in order to show that there was a clear and unmistakable error. That is different under the holding in Archer from the review of a decision by the board that there was no clear and unmistakable error. In other words, the Veterans Court is not reviewing the substance of the allegations, whether it met the criteria set out in Morse or not. The Veterans Court is reviewing under its authority to review decisions of the Board of Veterans' Appeals to whether or not that decision was legally correct. So we're reviewing a rejection of a Q claim, but we're not supposed to consider the criteria set forth in Morse about what would establish a Q claim? Of course you can consider that, but you can only consider that in relationship to the averment of error that was made before the Veterans Court. And the Veterans Court has to look at the allegation of error not made in the underlying challenge decision, but the averment of error that is made in the board's decision. The Veterans Court made it clear in Archer that they are reviewing what the board decided, not reviewing what the agency in the first instance or a board decision decided to determine whether or not that decision was clear and unmistakable error. That is what their own case law tells them to do. Along comes Evans, en banc, never mentions Archer, and sets out specifically that there are two separate criteria. There simply cannot be, and this court cannot look at the plain language of 7261 and say that there is one standard for clear and unmistakable error decisions that are on appeal, and one standard for decisions that they refer to as direct appeals that are based upon any other decision that the board would make on any other type of claim. So are you arguing that we should disapprove of Evans, which is not actually before us, but you're arguing we should disapprove of the Evans rule? If this court reads Evans as apparently Judge Greenberg read Evans, that there are two different standards, then yes, this court should reject that portion of Evans. And by the way, the decision in Evans has already been rejected by this court in its decision in Andrews on the merits that the failure to adjudicate an allegation or failure to adjudicate a TDIU claim is in and of itself a clear and unmistakable error, which is what the panel or the en banc decision in Evans was based upon. And that was in 2014, and this court in 2016 in the Andrews decisions rejected that the allegation of clear and unmistakable error for the failure to adjudicate is the legal basis for an allegation of clear and unmistakable error. I see that I'm way into my rebuttal time, and I'd like to reserve. Thank you. Good morning. May it please the court. How do you pronounce your last name? Pelkey. Pelkey. Yes. Mr. Pelkey, let's get right to the difficulty in this matter. First of all, let's talk a little bit about Evans, because that seems to be a problem. Evans starts out saying, moreover, other evidence supports the board's finding that the evidence of record was not undebatable that the appellant was unemployable due to his PTA. It's a triple negative. I can't even understand the sentence, much less unscramble all the negatives in it. But do you think Evans is the culprit in this whole thing? What is the evil in all of this that we have to unscramble? I don't think there is one. I think that what we see in Evans, including the dissent from Judge Greenberg, who penned the opinion here, and what we see in Judge Greenberg's opinion, which is rather strident and exhibits frustration, is simply different tribunals all applying well-settled standards in the CUE context, which is that the board applies the well-known CUE standard of unavailable error outcome determinative based on facsimile at the time. The Veterans Court applies arbitrary and capricious to that, reviewing that decision. The frustration in Evans, you read all those dissents line up, basically boil down to judges saying that they would have gone the other way on arbitrary and capricious. That they thought that there was CUE below and that they would have reversed. It's the same thing that Judge Greenberg says in the opinion here. He says he would have found CUE if he were at the board level, but he's not. He's reviewing the board decision under the arbitrary and capricious standard. Applying that standard, and frankly, an example of, given his opinions, extraordinary judicial restraint, he looks at the board decision and says, look, the outcome determinative piece, and that seems to be the piece that's frustrating certain tribunals in certain cases, right, where there are difficult facts. But difficult facts can make bad law. Have to apply the standard. And when the arbitrary and capricious standard is applied to a board decision that says, look, if I look at all of this, it's not outcome determinative. I see things that could support a finding of some level of employability. Because of that, there's no clear and unmistakable error. Once the board makes that sort of decision that support it, the Veterans Court is virtually bound, if it's applying the standard correctly, under the arbitrary and capricious standard to say, look, the decision here is not so implausible as to, you know, not be ascribable to a difference of opinion under the arbitrary and capricious standard. It is supported. I might disagree with it if I were deciding at the board. I may have found clear and unmistakable error because I actually don't think it is, or I think it is outcome determinative, contrary to what the board found. But that's not the standard. I read to Mr. Carpenter what I think Judge Greenberg held, which is in its decision, the board cited evidence, the board cited evidence, that the court has previously found sufficient to deny a motion for revision based on Q. The evidence is that the appellant was capable of coherent and logical thought, period, end of sentence. And then he says, I need not address any other arguments. Well, that can't be right, is it? Is that right? Is that what the law of Q is, that if the board cites evidence that the appellant was capable of coherent and logical thought, that's the end of any Q complaint? Can that be right? Well, I think in the context of that opinion, that is the point where Judge Greenberg reached the wall of outcome determinative, that the presence of that evidence, which is what the board relied on, and in a more fulsome manner than if the court goes back and looks in the record at the board opinions as opposed to Judge Greenberg's frustrated opinion. There's more explanation of the various diagnoses and the things that we find there. But in sort of almost a shorthand, Judge Greenberg gets to that point where the board located things that could support a finding of some level of employability. That's where it ended. Because that's what could, it's outcome determinative. That if the veteran is coherent and capable of logical thought, that's relevant to his employability, which is what the issue was before the board. But that can't be all that's relevant, can it? I mean, how about if he's otherwise paralyzed? How about if he's otherwise got Parkinson's and is unable to, he's a plumber and he's unable to hold his hands steady? Doesn't that have something to do with employability? Well, certainly. Even if he can sit up here and talk to us? Certainly. And that's what the board decision goes through, all of the evidence. Can you give us the citations to the board decision? Do you have the citations? Yes, Your Honor. And they're rather lengthy, because I think as the board knows just from reading the beginning of the opinion, there was a lot of remands. There were issues of rating level, et cetera. The sort of core aspect of the opinion that's here begins around Appendix 170. That's where the discussion of the February 1980 examination occurs. And that goes to the end of that opinion, which appears at Appendix 177. Thank you. And talking about the board's decision, did you ever figure out how many years the board took in total to get around to making its decisions? There ought to be an estoppel, shouldn't there? It's, again, I- The motion for revision was filed in 1997, right? Right. And it didn't get, 2012 was when the first decision came, and then there was a series of remands resulting or coming here. And as I said, the factual record here is a difficult one, not only from the diagnoses, which now are 30 and 40 years old. We have paragraphs of adjectival descriptions of a man and what he's suffering in an attempt to reach a decision. And then you have a board coming in, applying a CUE standard decades later, trying to reason through that. And then a veterans court, one further level of remove coming in, and now we are at yet another level of remove. And one of the things about this case on direct and collateral appeal, I think it highlights the care that's always implicit in the standards of review that are applied on collateral review, that recognize the distance from the fact find, the distance from the initial determinations, and to try to frame those reviews in a way that respects finality and respects that distance. And I think that when one looks in the final analysis at this case, even through that difficult record in all those years, everybody did their job along the line. The RO looked at the evidence and made a determination. There's no allegations that evidence wasn't looked at, there was something missing. The board came in, applied the correct standard, wrote up reasons and analyses that the veterans court accepted. The veterans court came in, applied the correct standard, arbitrary and capricious, and determined that the decision was correct. And I think that that ends this case. There's nothing that goes more to do. The only thing the government has got going for it in this case is that the veteran has been on 70% disability from the beginning. He's on 100% since 1993. That's not in the record. That's not in the record. He's on 100%. He's on 100% since 1993. What would he get then if he... TDIU finding would be retroactive to... So what's the difference between the TDIU and 100% disability? From 1993 forward? I don't think there's necessarily a difference. There may be certain instances where there may be some extra for... But I think it would be basically the same. So this is more about that pre-100% period. So the 1980 time period from... Yeah, exactly. From 1993. Exactly. And during that period... And again, if you look at the... I cited the portion of the decision that has to do more directly with this issue specifically, the CUE. But if you go a little bit further back before page 170 in the appendix, you'll see discussion of the 70% ratings decision, why that was reached, specifics to a diagnosis of schizophrenia that's at different levels and things like that. Okay. Thank you. Thank you, Your Honor. Just to clarify that last discussion, Mr. Encarcion would be entitled to a total rating based upon unemployability for the period from 1980 until 1993, approximately 14 years. Obviously, once he got the 100%, they're interchangeable in terms of the amount of compensation that he receives. It's just a different... You don't get more for being... No. But there's... No. But through post-1980, he was receiving some. It just wasn't 100%. That's correct, Your Honor. So you're looking at the difference between 70% and 100%? I'm not exactly sure what the underlying was, but it was probably 70%, so it would probably amount to the difference, at least in today's dollars, of about $1,200 to $1,500 a month. In the rather bizarre way in which the VA pays, it's 10% increments up to 90%, but the difference between 90% and 100% in terms of money is, I believe, about 45% numerically. So the difference between whatever he was rated less than a total scheduler rating would be paid at the total rate, and then he would be paid the difference between the scheduler and the total rating. What do you want us... Do you want us to do something about Evans? Do we have to do something about Evans in order for your client to win, or can we... What is it you want us to do, Mr. Carpenter? To follow up on your initial comment, I think it would be very helpful to all practitioners and the Court to understand what scope of review is about and how that is... It's not about anything. The standard of review is what it's about. And does 7261 articulate that standard of review? And I believe that it does, and that it identifies the specific standard of review that the Veterans Court is to apply when reviewing these decisions. And if Judge Steinberg were to have believed, as he seems to in his opinion, that the benefits should have commenced in 1980 based upon the private doctor's statement, that that was an arbitrary and capricious decision by the Board of Veterans' Appeals to have denied the application of 4.16. Unless the panel has any further questions, I'm happy to see the balance of my one minute. Thank you. We thank both sides. It never hurts to finish early. The next case for argument is 18-2322, Glam v. Lightbomb Technology.